Diane MURRAY, Plaintiff,

v.

PITTSBURGH BOARD OF
EDUCATION, et al.,
Defendants.

Civ. A. No. 86–1433.

United States District Court,
W.D. Pennsylvania.

March 6, 1991.

posed findings of fact, we proceed to rule on the questions presented by the motion.

Plaintiff's eleventh-hour motion seeking a court order restraining a proposed psychiatric examination was based on allegations that the motivation for the examination was to retaliate against her, presumably for bringing a civil rights suit against the Pittsburgh Board of Education and several of plaintiff's supervisors. Plaintiff also raised the argument that a compelled psychiatric examination is an unconstitutional search and seizure in violation of the Fourth and Fourteenth Amendments.

Neither of these two contentions was supported. We therefore deny plaintiff Diane Murray's motion for a preliminary injunction, forfeit plaintiff's security bond, and dissolve the temporary restraining order. Defendants may make any application necessary for costs in excess of the amount posted as bond within ten days of this Order.

We look first to the showing required of a plaintiff who seeks issuance of a preliminary injunction.

In order to support a preliminary injunction, plaintiff must show both a likelihood of success on the merits and a probability of irreparable harm. *Hohe v. Casey*, 868 F.2d 69, 72 (3d Cir.) *cert. denied*, —— U.S. ——, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989). Additionally, the district court should consider the effect of the issuance of a preliminary injunction on other interested persons and the public interest. *See Arthur Treacher's Fish & Chips, Inc. v. A & B Management Corp.*, 689 F.2d 1137, 1143 (3d Cir.1982).

*Bradley v. Pittsburgh Board of Education*, 910 F.2d 1172, 1175 (3d Cir.1990). We examine first the evidence presented in support of Diane Murray's claim that she is likely to succeed on the merits.

Plaintiff alleged that Lee B. Nicklos, personnel director for the Pittsburgh Board of Education, embarked on a deliberate "plan

Edward F. Olds, Michael Rosenfield, Jon Pushinsky, Pittsburgh, Pa., for plaintiff.

David M. Neuhart, Pittsburgh, Pa., for defendants.

## MEMORANDUM ORDER

D. BROOKS SMITH, District Judge.

Diane Murray's fourth motion for a preliminary injunction was the subject of an evidentiary hearing held on February 11, 1991.[1] Having received plaintiff's post hearing letter brief and defendants' pro-

---

**1.** Murray's second motion for a preliminary injunction is pending before this Court; Murray's

third motion for preliminary injunction is pend-

of retaliation",[2] Motion, Paragraph 3, which was to be carried out by subjecting Murray to accusations of mental disability with the ultimate goal of "driv[ing] Murray from the school system." *Id.* Plaintiff did not in her motion allege why it was that defendants were retaliating against her, nor did she address the subject in her hearing testimony. The only time plaintiff even departs from allegations of retaliation "in the air" and touches on a concrete question of motivation is in the potboiler fiction style prose of plaintiff's memorandum:

> All that is left for the Defendant [again unidentified] herein is Murray's outspokenness and her staunch belief in her constitutional rights. This is not an acceptable reason. Psychiatric studies are not called for simply because a person is a dissident.

Memorandum on Privacy Issue, 8. It is absolutely repugnant to this Court that a charge of Soviet-style psychiatric oppression for purposes of retaliating against a dissident should be leveled at the defendants in a lawsuit when no attempt is then made to support such an accusation.

The evidence which the Court heard shows the following: in late November, 1990, Mrs. Spolar, the associate director of employee relations for the Pittsburgh Board of Education, received a telephone call from deputy superintendent Helen Faison about an incident between Diane Murray and another employee at the Letsche Alternative School which arose at a parent-teacher conference. Spolar, whose testimony impressed us as credible and accurate, told Dr. Faison that there was not much that could be done because the contretemps between Murray and Johnson, the other employee, had been a matter of words exchanged without an administrator present and that in such matters it was difficult to prove who was responsible. Later, Faison sent Spolar a report from Vernon Phillips, the Letsche principal whom we have heard

and found to be reliable in an earlier proceeding. Because of Phillips' reported growing concern about Murray's ability to interact with others and fitness to teach, and because of Murray's almost unique history of prolonged absences from work, Spolar decided to obtain a comprehensive medical evaluation of Diane Murray.

Spolar discussed the idea of an examination with Faison and with the Board's special labor counsel, Mr. Bruce Campbell. Spolar also notified Mrs. Lee B. Nicklos of her plan when Nicklos returned to the office after a vacation in late November. Spolar made arrangements for a mental and physical evaluation of Diane Murray with Dr. David Spence, a psychiatrist associated with the Sewickley Valley Hospital. Nicklos scheduled a meeting with Murray for December 20, 1990, but Murray did not attend, claiming that she had a pinched nerve in her neck. Murray notified Nicklos personally and through her union representative that she would not be attending. On January 4, 1991, Nicklos finally met with Murray, and instructed her that she should attend a psychiatric evaluation with Dr. Spence on January 9, 1991. Plans which had been made for physical examinations on the same day had to be changed because of Murray's failure to attend the pre-Christmas meeting, but it was clear to everyone at all times that both physical and psychiatric examinations were planned. At 6:25 p.m. on the night before the first examination was scheduled, plaintiff submitted her motion for a restraining order.

Plaintiff raises a variety of reasons why this Court should prevent her from being examined by the School Board. First, Murray asserts that a compelled psychiatric examination is an unconstitutional invasion of privacy. Secondly, she continues to allege that the motive for the examinations is retaliatory, again without specifying which of her actions or conduct evoked the retali-

---

ing before the Court of Appeals for the Third Circuit after this Court denied her relief.

**2.** Plaintiff refers to "Defendant's" plan without clearly specifying which defendant she means. Because the paragraph begins with an attack on

Ms. Nicklos, we presume that "Defendant's current plan of retaliation" intends "Defendant" to refer back to Ms. Nicklos. Otherwise, plaintiff's motion and entire course of proof at the hearing would make no sense.

atory response.[3] Finally, she alleges certain defects in the Board's procedure under what she alleges is the controlling statute, the Pennsylvania School Code, 24 P.S. § 14–1401 et seq.

The controlling authority in this Circuit on the issue of employee privacy stems from two opinions authored by Chief Judge (then Judge) Sloviter, *United States v. Westinghouse Electric Corp.*, 638 F.2d 570 (3d Cir.1980) and *F.O.P., Lodge 5 v. City of Philadelphia*, 812 F.2d 105 (3d Cir.1987), *appeal after remand* 859 F.2d 276 (3d Cir. 1988):

> The factors which should be considered in deciding whether an intrusion into an individual's privacy is justified are the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Westinghouse*, 638 F.2d at 578; *F.O.P., Lodge 5*, 812 F.2d at 110. In weighing the relevant factors, the Circuit decisions must be read together with the Supreme Court's recent employee privacy cases. *See National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) and *Skinner v. Railway Labor Executives Association*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The Supreme Court decisions make it explicit that the School Board's collection of medical information from a teacher must be analyzed by balancing "the individual's privacy expectations against the Government's interests," *Von Raab*, 489 U.S. at

665, 109 S.Ct. at 1390 in light of the Fourth Amendment's prohibition of unreasonable searches and seizures. *Skinner*, 489 U.S. at 618–19, 109 S.Ct. at 1413–14. *See also Bluestein v. Skinner*, 908 F.2d 451 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991).

■ The "individual's privacy expectation" referred to in *Von Raab*, is the shorthand summary of the first four *Westinghouse* factors as applied to this case: (1) and (2) the type of information requested; (3) the potential for harm in the case of a nonconsensual disclosure; and (4) the injury from disclosure to the relationship in which the information was generated. The governmental interest prong of *Von Raab* is simply the last two factors of *Westinghouse:* (1) the degree of need for access; and (2) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access. *Westinghouse*'s other factor, the adequacy of safeguards to prevent unauthorized disclosure, is analytically part of the question of potential for harm from nonconsensual disclosure.

*The type of information requested:* the School Board seeks a full medical examination of Diane Murray. There can be no doubt that medical and particularly psychiatric information are of the types most associated with expectations of privacy. *F.O.P., Lodge 5*, 812 F.2d at 113. *Skinner*, 489 U.S. at 616–17, 109 S.Ct. at 1412.

At the same time, however, we also must recognize that "the type of medical information [sought by the School Board] has customarily been supplied as part of the application process," *See F.O.P., Lodge 5*, 812 F.2d at 113–14, and that psychological testing and psychiatric interviews are a routine feature of occupations which involve stress and sensitive interpersonal

---

**3.** Plaintiff's post-hearing memorandum is particularly offensive in this respect. Plaintiff asserts that "a retaliatory motive is not unlikely" *Id.* at 10. An unfocused allegation of malign motives by a defendant after the reasonable investigation required by Rule 11 would be understandable. But the invitation to pure speculation about Mrs. Nicklos' motives made after a hearing in which it was made clear that the scheduling of the examinations was directed by Mrs. Spolar and in which exploration of Nicklos' motives was never conducted by plaintiff's counsel, indicates to this judge that the motivation for plaintiff's actions has ceased to be a desire to vindicate her legal rights through resort to the Court and has become rather a desire to heap unfounded abuse on her supervisors in a protected forum.

contact. Indeed, leaving the abstract case which we consider for the constitutional proposition, the credibility with which Diane Murray asserts in this matter that medical and psychological information is dear to her personally is greatly diminished when one considers that Murray has indicated throughout that she is willing to provide information compiled by *her* internist and *her* psychologist and *her* therapist. Plaintiff's Motion, Paragraph 16.

■ *The potential for harm from nonconsensual disclosure:* the harm from disclosure of any information gathered by the physicians chosen by the Board is the product of two factors: (1) the likelihood of nonconsensual disclosure, or, as stated from the opposite point of view in *Westinghouse,* the adequacy of safeguards against disclosure; and (2) the degree of harm likely to result from disclosure. The harm likely to occur from nonconsensual disclosure is embarrassment and disclosure of sensitive personal information, which we would rank as an exceptionally serious matter.[4] However, the evidence given at the preliminary injunction hearing satisfies us that the risk of nonconsensual disclosure of any information generated by medical examinations is sufficiently small that the danger can be disregarded. First, plaintiff produced no evidence that there has *ever* been a nonconsensual disclosure of information arising from a Board ordered medical examination. Secondly, defendants showed that the information from any medical professional's examination is not ever disseminated to the school administration, teachers' union, or public nor becomes part of an employee's personnel file, but remains within the medical department, a separate unit within the Office of School Management. Both Spolar and Nicklos tes-

tified, and we credit their testimony, that a summary may be received from an examining physician with a recommendation as to an employee's fitness to return to work. That summary, as its appellation suggests, does not involve the substance of any matter delved into in the examination. See *Daury v. Smith,* 842 F.2d 9, 15 (1st Cir. 1988).

■ Plaintiff Murray, seizing upon a portion of the opinion of *F.O.P., Lodge 5,* asserts that because there are no formal statutory penalties provided for disclosure of medical information, a compulsory examination is *per se* unconstitutional. Plaintiff's Memo, 7–8. As (now Chief) Judge Sloviter recognized in *F.O.P., Lodge 5,* the level of safeguards found adequate has varied depending on the specific facts of each case. 812 F.2d at 118, citing *Whalen v. Roe,* 429 U.S. 589, 605–06, 97 S.Ct. 869, 879–80, 51 L.Ed.2d 64 (1977) (statutory penalty for disclosure of prescription drug records); *Shoemaker v. Handel,* 795 F.2d 1136, 1144 (3d Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (agency regulations making drug testing results confidential); *Westinghouse,* supra, 638 F.2d at 580 (data kept in locked cabinets and removed after 6 months, regulation against disclosure); *Nixon v. Administrator of General Services,* 433 U.S. 425, 462, 97 S.Ct. 2777, 2799, 53 L.Ed.2d 867 (1977) (no regulations, but archivist had "unblemished record for discretion" in avoiding public disclosure). Certainly the School Board, on the record made by plaintiff, has an unblemished record for discretion, and we find the confidentiality practices observed by the School Board's medical unit to be at least as secure as those in *Westinghouse.* See also 24 P.S.

---

**4.** We reject, however, plaintiff Murray's attempt to equate the presence of a union representative at the January 3, 1991 meeting with disclosure of private information about her. (Given the course of litigation in this case, it is quite possible that Murray would have been in Court complaining had there *not* been a union representative present at the meeting. *See e.g.* Plaintiff Murray's Third Motion for an Order Finding Vernon Phillips in Contempt, Exhibit "A", Paragraph 3 (Consent Order)). It trivializes the concern which the Courts have had for unautho-

rized disclosures of personal information to suggest that the mere fact of scheduling medical examinations is entitled to equivalent protection. Murray also appears to assert that the knowledge of her fellow teachers that she was suspended and called her to ask "what was up" constitutes an invasion of privacy. This argument is charitably described as specious. Murray admitted on cross-examination that the teachers who called did not even know that the reason that she was suspended was a pending medical examination.

§ 14–1409. (confidentiality provision for health records)

*The degree of need for the information, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward disclosure:*

There is ample reported precedent for the proposition that medical information, and particularly psychiatric information, is legitimately sought by a school board from teachers who on a daily basis are charged not just with interacting with students but also with shaping the course of their lives. *Daury v. Smith,* 842 F.2d 9, 14 (1st Cir. 1988). That there is a recognizable public policy favoring the disclosure to school administrators of medical and behavioral information concerning a teacher's actual or potential problems can be seen most easily by examination of the consequences of failure to investigate problem areas. *See Stoneking v. Bradford Area School District,* 882 F.2d 720, 729–31 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (denying qualified immunity to school principal and assistant principal who allegedly failed to make adequate inquiry into sexual abuse of student by teacher).

In weighing these factors, there are two competing structural concerns implicated by plaintiff's assertion that the medical examinations ordered lack a constitutional basis, one of which is to ensure that arbitrary and capricious examinations which impinge on a privacy interest do not occur, *see United States v. Martinez–Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) ("some quantum of individualized suspicion" normally is necessary to make search reasonable), and the other of which is to preserve the proper amount of deference by the federal courts to the organs in society which are charged with the duty of providing effective public education.

■ Because we are a lower court and cannot predict the scope of the review of this issue by the Court of Appeals, we will address both concerns. In our opinion, however, once the alleged retaliation by the School Board defendants was disproved, the basis for federal review of Spolar's decision to schedule an examination of plaintiff Murray, or of Nicklos' decision to order her to undergo the examination, disappears. Unlike the factual patterns of *Von Raab, Skinner, Westinghouse, Bluestein, F.O.P., Lodge 5, Whalen* and *Shoemaker,* we are not being asked to determine the constitutional adequacy of the procedure for deciding whether to seek an examination. Plaintiff asks this Court to sit in review of the probable cause for a particular administrator's decision to seek the examination of a particular teacher in response to a pattern of absences and a specific incident in Letsche Alternative School in November, 1990.

■ There is no requirement that before a school administrator seeks a medical examination of a teacher, the administrator must hold a (federal) probable cause hearing or submit affidavits in support of the examination to a judicial officer for review.[5] To impose such an additional layer of procedure upon the school administrator, who is presumed to be the impartial authority who decides whether there is sufficient evidence to justify evaluation, would in all likelihood prevent any examination from taking place within one school year of events giving rise to the administrator's concern. Although a governmental body is free to impose such restrictions on itself, Pennsylvania has not done so, and it is not required by federal constitutional law. *See Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). *Mathews* explicitly sets forth three factors that must be considered relevant to deciding whether a pre-examination hearing must be held: (1) the weight of the private interest; (2) the value of additional safeguards; and (3) the cost of the procedural

---

**5.** Ignoring the assignment of burdens of proof at the preliminary injunction stage, plaintiff Murray dwells at length on what she contends is the lack of evidence to show that Murray's con- duct was "irrational". See Plaintiff's Memo at 4–5 ("Strikingly, Principal Phillips did not testify. So, the Court was not favored with first hand testimony …".).

safeguards. Obviously, the first two *Mathews* factors are identical to those discussed above. As for the cost of procedural safeguards beyond those provided for in the collective bargaining relationship, this protracted and Hydra-like litigation stands as stark evidence that too much procedure can be a source of great cost and delay.

▌ On the merits, if the Court of Appeals decides that merits review is appropriate, we find that Spolar's decision to seek a medical evaluation of Diane Murray is neither arbitrary nor unsupported by a factual basis. For several years, the testimony at the hearing showed, Murray's absenteeism (due to illnesses which Murray herself relates to job stress) has been excessive and almost unique. Some of those absences, most particularly the ones in November, 1990 and August, 1988, came immediately after a disagreement or confrontation with other school employees. In November and December, 1990, Diane Murray worked only 4 days between Thanksgiving and Christmas. In November, 1990, Spolar also had a report from Diane Murray's supervisor in which he expressed concern about her ability to function in the classroom. We were given no reason to believe that either Phillips' concern for Murray's ability, the evaluation of that concern by Spolar, or the supervision of Spolar by Nicklos were undertaken without appropriate consideration both for Diane Murray and for those with whom she deals as a teacher.[6]

▌ Finally, plaintiff argues that because the School Board did not follow the provisions of the School Code in arranging Diane Murray's medical examinations, we should issue an injunction barring them. We would ordinarily refrain from construction of a state statute in light of the lack of state precedent, *Railroad Commission of*

*Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), but both parties urge us to decide the issues, and the potential delay would have a deleterious impact on the parties that outweighs the benefits of abstention. *See Hughes v. Lipscher*, 906 F.2d 961, 964 (3d Cir.1990) (explaining requisites of *Pullman* abstention). We therefore proceed to consider the state law issues. There are three issues of state law raised by plaintiff Murray to justify the grant of an injunction: (1) the lack of a prior resolution of the School Board that Murray be examined; (2) the status of Dr. Spence as a "school physician"; and (3) the provision in the School Code for examination of a school employee by her own physician.

▌ The School Code was amended by the Act of July 15, 1957, P.L. 937, § 2, to add Article XIV, entitled School Health Services, codified at 24 P.S. §§ 14–1401 to 14–1422. In pertinent part, Section 14–1418 of the Code provides:

(c) School boards may require a special medical examination for any school employee at any time.

(d) Medical examinations shall be made by the school physician of the district ... or by a physician of the employee's own choice legally qualified to practice medicine. . . .

Contrary to plaintiff, we do not read subsection (c) to require a prior *resolution* of the school board to authorize a medical examination. School boards ordinarily delegate the actual operation of the school district to administrative personnel just as other boards of directors delegate management responsibility to corporate officers. To read subsection (c) to forbid an administrator to schedule a medical exam without a prior resolution would violate the canon of construction that the General Assembly

---

**6.** We also must note that if it were our duty to resolve any doubt as to whether a psychiatric evaluation might be a good idea, that doubt was dispelled by an incident at the injunction hearing. In response to a question from our court reporter, who was not at the previous injunction hearing, as to what Diane Murray said the first time she used the term "Learnball," Murray went into an extended, agitated, stream of con-

sciousness reply *directed to the court reporter* about the origins, merits, and implications of Learnball. This, from a woman who is familiar with court proceedings and who impressed us as quite collected at the August, 1990 hearing, was a striking behavioral change, which gives credence to the concerns of school administrators who see Murray on a much more frequent basis.

of Pennsylvania does not intend an absurd result. 1 Pa.C.S. § 1922(1). We also must question why a plaintiff whose concern is confidentiality insists that prior discussion of the merits of the examination by a school board is necessary.

■ "School physician" is defined in Section 14–1401(4) as a "physician legally qualified to practice medicine ... who has been appointed or approved by the Secretary of Health." *See also* 1 Pa.C.S. § 1991 ("Physician"). Additionally, a school district may engage the services of other licensed medical specialists for special examinations recommended by the school physician. 24 P.S. § 14–1410.

Mrs. Nicklos stated that the Pittsburgh Board of Education does not have a "school physician" as that term is defined in the School Code. We gather from the testimony that the School Board, charged with operating public schools in Pennsylvania's second largest city, and employing well over 5,000 persons, operates in its Office of School Management a medical department which contracts with consultants for health examinations and evaluations. This system for delivering health services comports with the intent of the School Health Services article to ensure the health and safety of school students, and we do not read Section 14–1418(d) to prevent a school district from hiring medical experts on a consulting basis. It again would be absurd to construe Section 14–1410 to permit a school physician acting upon an identical request from an administrator to schedule a series of medical examinations but bar the supervisor of the medical department acting upon an identical request from an administrator to schedule the identical series of exams, and in practice in the Pittsburgh School District Section 14–1410 has not been so construed.

■ Finally, plaintiff suggests that in any case the School Board can compel her to undergo evaluation only with the physician of her choice.[7] The School Code does not provide that the employee may direct the choice of examiner, and to read such a term into the statute would run counter to the intent of Subsection 14–1418(c) to provide for an evaluation for the benefit of the school board of "any school employee at any time."

Therefore, we

ORDER, that the Temporary Restraining Order is dissolved. The $1000 security posted by plaintiff is forfeited. Defendants may make application within ten (10) days for costs incurred by the issuance of the temporary restraining order in excess of the bond posted.

---

7. We note that "the disruption of an existing professional relationship" mentioned as a significant factor in *Westinghouse,* and which we did not discuss above, is only a concern if plaintiff is examined by a physician who is currently treating her, for there is no professional relationship to disrupt in an examination with an independent physician.