

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-2001

# Kerns v. Chalfont-New Britain

Precedential or Non-Precedential:

Docket 00-1391

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Kerns v. Chalfont-New Britain" (2001). *2001 Decisions.* Paper 172.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/172

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 3, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1391

GREGORY KERNS,
      Appellant

v.

CHALFONT-NEW BRITAIN TOWNSHIP
JOINT SEWAGE AUTHORITY

Appeal from the United States District Court
For the Eastern District of Pennsylvania
D.C. No.: 99-cv-01596
District Judge: Honorable John P. Fullam

Argued: April 3, 2001

Before: SCIRICA, ROSENN and GIBSON,*
Circuit Judges.

(Filed August 3, 2001)

      Randal S. White (Argued)
      Fox, Rothschild, O'Brien & Frankel
      102 North Main Street
      P.O. Box 1589
      Doylestown, PA 18901-0700

      Counsel for Appellant

_____

* Judge John R. Gibson, United States Court of Appeals for the Eighth
Circuit, sitting by designation.

          Daniel J. Divis (Argued)
          Gerolamo, McNulty, Divis & Lewbart
          225 South 15th Street
          The Lewis Tower Building,
           Suite 1600
          Philadelphia, PA 19102

           Counsel for Appellee

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal challenges the unwritten policy of a state
regulated Sewage Authority to subject its superintendent to
urinalysis drug testing. Gregory Kerns, the plaintiff, sought
employment in 1997 as the superintendent of a waste-
water treatment facility operated and maintained by the
Chalfont-New Britain Township Joint Sewage Authority
("the Authority"). During his interview, the Authority
informed Kerns that he would be required to undergo and
pass a drug screening urinalysis as a condition of
employment. He agreed and was permitted to make his own
arrangements for the testing. He failed. He requested and
the Authority granted another opportunity for testing and
this time he passed. About 60 days later, the Authority
asked Kerns to undergo another urinanalysis. He expressed
no objection, provided a urine sample, and tested positive
for marijuana. Kerns, still on probationary status, was
discharged.

Kerns filed an action in the United States District Court
for the Eastern District of Pennsylvania under 42 U.S.C.
S 1983, seeking reinstatement, declaratory judgment, and
damages. He alleged that the Authority violated his Fourth
Amendment right to be free from unreasonable searches
when it required him to submit to and pass a drug test as
a condition of employment. The District Court granted
summary judgment in favor of the Authority, holding that
Kerns' legitimate expectations of privacy were lessened by
the "disastrous consequences" that can occur when
mistakes are made in the operation of a sewage treatment

2

plant. The Court also held that Kerns had consented to the drug tests, thereby rendering them constitutionally permissible. Kerns timely appealed. We affirm.

I.

The Authority is a municipal agency authorized, organized and existing pursuant to the Pennsylvania Municipal Authorities Act of 1945, 53 P.S. S 3.91 et seq. In May 1997, Kerns applied to the Authority for the position of plant superintendent. The plant superintendent supervises approximately 15 employees and reports to the Executive Director, who in turn reports to the Authority's Board of Directors.

Wastewater treatment plants in Pennsylvania are highly regulated and the Authority maintains that they can cause disaster to the local waterways and, consequently, to the health and safety of the local people and others downstream. We note that Pennsylvania has had a century-long interest in the cleanliness of its streams, waters and lakes. At the turn of the twentieth century, Pennsylvania embarked upon a program of preventing the pollution of its waters. See Act of 1905, P.L. 260, entitled "An Act to preserve the purity of the waters of the state for the protection of the public health."

Consistent with this concern for unpolluted streams, Pennsylvania enacted further legislation from time to time. In 1937, the State enacted its Clear Streams Law which included prohibitions against industrial, as well as human waste. 1937 P.L. 1987, 35 P.S. S 691.1 et seq. It declared as state policy that 1) clean streams were "absolutely essential" if Pennsylvania were to attract new industries and tourists; 2) that clean unpolluted waters was absolutely essential for the State's out of door recreational facilities in the decades ahead; 3) that the objective of the Act was not only to prevent further pollution of the waters of the Commonwealth but to reclaim every stream that is polluted to a clean and unpolluted condition; and 4) that achievement of the Act's objectives required "a comprehensive program of watershed management and control." 35 P.S. S 691.4. The Clean Stream Law is a

3

regulatory statute and, as subsequently amended, bars any person or municipality from discharging or permitting the discharge, directly or indirectly, into waters of the Commonwealth any sewage except as provided by the Act. Failure of a municipality to comply may result in the facility being declared a nuisance subject to severe civil penalties, and its officials subject to contempt.

In 1965, the state enacted the Pennsylvania Sewage Facilities Act. As amended in 1974, the Act empowered the Department of Environmental Resources, inter alia, to adopt standards for maintenance of community sewage disposal systems. See 35 P.S. S 750.3, historical and statutory notes. The Department also has the power to review the performance of local agencies in the administration of the Act, to order a local agency to undertake actions deemed necessary by the Department"to effectively administer this Act, to inspect regular reports, books and records of local agencies, to revoke or suspend the certification of sewage enforcement officers for cause, and to require at the Department's discretion a certified sewage enforcement officer whose performance has been evaluated." 35 P.S. S 750.10.

With the State's strict laws pertaining to the operation of sewage treatment plants hovering over it, the Board, at the recommendation of its Personnel Committee, established an unwritten policy and practice that all new hires must submit to and pass a drug screening urinalysis as a condition of employment.1 When Kerns interviewed for the position of plant superintendent, he was informed that he would have to pass a drug test to obtain the job. Kerns agreed to submit to such a test.

A medical examiner performed the urinalysis on Kerns approximately two weeks after he began his employment. Kerns tested positive for marijuana use. When he found out about the positive test result, Kerns insisted that it was inaccurate and denied having used marijuana. After importuning by Kerns, the Authority's Board of Directors

_____

1. This policy is separate from the Authority's written policy mandating pre-employment and random drug testing for employees holding Commercial Drivers' Licenses.

4

agreed to permit him to submit to another drug test rather than terminate him.

On June 27, 1997, Kerns reported to another medical examiner for his second drug test. This time, the results were negative and the Authority allowed Kerns to continue his probationary employment.[2] At that point, Kerns claims, he believed that he had successfully completed his pre-employment drug testing and that he would not be subjected to further tests. (App. at 217–218). On the other hand, John Schmidt, the Executive Director, claims that he told David Cordell, the chairman of the Authority's personnel committee, to inform Kerns that he would have to undergo a random drug test some time in the future. (App. at 383–384). Cordell never mentioned this to Kerns. (App. at 473).

On September 2, 1997, Schmidt instructed Kerns to report for another drug test. (74A). Kerns was surprised, but did not object. Several days later, Kerns received a phone call from the laboratory that his urine sample had tested positive for marijuana. Kerns then informed Schmidt of the positive result. Later that day, at a meeting between Schmidt, Kerns and Cordell, Kerns pleaded for his job.[3] Kerns was told to go home and await further instructions. Later that day he received a phone call telling him not to come to work for a few days. On September 15, 1997, the Authority discharged Kerns because of his positive test result. Kerns then commenced this action under 42 U.S.C. S 1983.

On appeal, Kerns's primary contention is that the drug testing severely impinged upon his legitimate privacy expectations, and that in the absence of a compelling need

_____

2. The Sewage Authority places all new hires on probation for the first six months of their employment, after which they are considered permanent employees.

3. Kerns claims that he did not admit to smoking marijuana, but admitted that he had recently been exposed to second-hand smoke at a party where others were smoking marijuana. (App. at 235). Schmidt claims that Kerns admitted that he himself had smoked marijuana at that party. (App. at 392).

5

for the Authority's drug policy, the policy is constitutionally impermissible.

II.

It is settled law that the collection and analysis of a urine sample to test for drug use constitutes a search that is subject to the constraints of the Constitution's Fourth Amendment. See Skinner v. Railway Labor Executives' Association, 489 U.S. 602, 617 (1989). However, it is also settled law that a search conducted with the free and voluntary consent of the person searched is constitutional. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1972). In its alternative ground for granting summary judgment for the defendants, the District Court held, without much discussion, that Kerns consented to drug testing. (Op. at 4). We begin our analysis with this ground because if there was a valid basis for it, we need not evaluate the constitutionality of the Authority's drug testing policy.

Whether a person consented to a search is a question of fact to be determined from the totality of the circumstances. See Schneckloth, 412 U.S. at 226. We review for clear error the District Court's factual finding that Kerns consented to the tests. When Kerns first interviewed for his position at the Authority, he was informed that he would have to take a drug test as a condition of employment. In response, Kerns replied, "I'm just fine. I have no problem." This statement is nearly identical to the language held to convey consent in Schneckloth, where a motorist said "sure, go ahead" when the police asked if they could search his car. See id. at 220.

On May 28, 1997, the Sewage Authority extended a conditional offer of employment to Kerns. This offer was made by way of a letter from John Schmidt which stated "this offer is contingent upon successful completion of the pre-employment physical and drug test as we discussed." (A. 519). Kerns signed this letter, indicating that he accepted the offer and the terms contained therein.

The first urinalysis took place approximately two weeks after Kerns began his employment. Kerns voiced no objection to the test and, in fact, made all the arrangements

6

for the test himself. Unfortunately, the test results were positive. Kerns insisted that the test was inaccurate and asked the Authority for permission to take a retest. Although the Authority would have been within its contractual rights to terminate Kerns at that point, it agreed to allow him to submit to another test. On June 27, 1999, Kerns reported to a different medical examiner for his second drug test. This time Kerns passed, and was allowed to continue his probationary employment.

The circumstances surrounding the first two tests demonstrate Kerns' voluntary consent. Kerns was told during the interview that he would be required to pass a drug test as a condition of employment. He stated that he had "no problem" with taking such a test and signed a contract acknowledging that his offer of employment was contingent on it. He then submitted to the test without objection. The second test was administered at Kerns' own request. Under these circumstances, we agree with the District Court that Kerns' consent to the searches was clear.

Consent to the third and final test is less clear. Approximately two months after Kerns passed his second drug test, he was approached by John Schmidt, the executive director, who instructed him to produce another urine sample for analysis. Kerns, who believed that his drug testing obligations had been completed, was surprised, but submitted to the test without objection. It is the law of this circuit that "silent submission" to a drug test "on pain of dismissal from employment" does not constitute consent. Bolden v. SEPTA, 953 F.2d 807, 824 (3d Cir. 1991). However, Kerns did more than silently submit. He had signed a document in which he agreed to "successful[ly] complet[e]" a pre-employment drug test as a condition of his employment. The conflicting results of Kerns' first two tests were inconclusive. Therefore, it was reasonable for the Authority to view Kerns' drug testing obligation as incomplete and to require that he successfully complete that obligation as he had contracted to do. Accordingly, we see no error, much less clear error, in the District Court's alternative conclusion that Kerns consented to all three drug tests.

7

The judgment of the District Court will be affirmed. Each side to bear its own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

8